## AUTOMATIC DRAFT & STOVE CO., Inc., v. AUTO STOVE WORKS.

### No. 18.

District Court, W. D. Virginia.
July 16, 1940.

Charles R. Fenwick and J. Howard Flint, both of Washington, D. C., and Douglas A. Robertson, of Lynchburg, Va., for plaintiff.

Richard E. Babcock and Arthur M. Hahn, both of Washington, D. C., and Royston Jester, Jr., of Lynchburg, Va., for defendant.

PAUL, District Judge.

The plaintiff in this case is a Virginia corporation having its principal place of business at Lynchburg, Virginia. The defendant-intervener, which will hereinafter be called the defendant, is an Illinois corporation having its place of business at New Athens, Illinois.

The case involves the alleged infringement of two patents owned by the plaintiff, the first being patent No. 1,786,931, issued to Camb J. Ashley on December 30, 1930, and the second a patent No. 2,170,728, issued to Charles D. Montague on August 22, 1939. These patents respectively will hereinafter be referred to as the Ashley patent and the Montague patent.

The patents relate to wood-burning stoves equipped with a thermostatically controlled draft, which will be hereinafter more particularly described. This suit was originally brought against Bailey-Spencer Hardware Company of Lynchburg, Virginia, which was charged with selling a stove alleged to infringe the patents owned by the plaintiff. The alleged infringing stoves had been purchased by Bailey-Spencer Hardware Company from the Auto Stove Works, which had manufactured them, and the latter company, by agreement, intervened and was substituted as defendant and Bailey-Spencer Hardware Company was eliminated as a party to the action.

As a prelude to considering the merits of the case, and as throwing some light upon the merits, a recital of the history of these patents and of the alleged infringing device is material.

During the year 1932 Mr. H. C. Adams, of Lynchburg, in the course of a business trip through eastern Virginia, had his attention attracted to a wood-burning stove being used for the brooding of young chickens in that section. He learned that this stove was made at a small town named Guinea, Virginia, and found that this brooder stove had been patented by C. J. Ashley, who was manufacturing and selling it in limited quantities. Being interested in the possibilities of the stove, Mr. Adams acquired the right thereto from Mr. Ashley.

Thereafter, and possibly a year or so later, Mr. Adams and certain associates organized a small corporation for the purpose of manufacturing the Ashley stove and moved the business to Fredericksburg, Virginia. At that time Mr. C. D. Montague, then living in Fredericksburg, and who had been trained as a mechanical and electrical engineer, became associated with the plaintiff company with duties which placed him practically in entire charge of the manufacturing and selling of its product.

The Ashley stove consisted of an airtight wood-burning stove with a down-draft stack arranged on the exterior of the stove with the damper of the draft at the upper end of the draft stack, the damper being controlled by a thermostat located at the top of the draft stack and in which the thermostatic element was of the wafer type. In the course of his duties with the plaintiff company while at Fredericksburg, Mr. Montague developed certain changes in the thermostatic control which were supposed to be improvements and which consisted of the elimination of the wafer as the thermostatic element and the substitution therefor of a rigid bi-metallic element, and which provided further for surrounding the top of the down-draft stack together with the thermostatic element in a cap or cover in order to exclude as far as possible the influence of room temperature and air currents. Montague made application for a patent on his improved stove under an agreement to assign his rights in said patent to the plaintiff corporation. A patent was later issued, which is the second patent in suit, known as the Montague patent.

Due to lack of capital and other causes not necessary to discuss, the plaintiff's business did not make satisfactory progress at Fredericksburg and, in 1937, it was found advisable to remove the business to Lynchburg, Virginia, and this was done. The officers of the corporation were eager to have Mr. Montague continue in charge

of the business, but he did not want to leave his residence at Fredericksburg; and on the removal of the business to Lynchburg, he severed his connection with it. Thereafter a disagreement occurred between Montague and the corporation as to compensation for the services which he had previously rendered and this resulted in litigation which was finally comprised by the plaintiff meeting in part the monetary demands of Montague. Apparently the severance of relations between Montague and the plaintiff corporation was not completed in a spirit of good will.

In September, 1937, a Mr. H. J. Waff, Jr., who is in the business of selling stoves, as the representative of five or six stove manufacturing concerns, had heard of the Ashley stove being manufactured at Fredericksburg and went to that place to learn of the prospects of including it in the line of stoves which he sold. He came in contact with Mr. Montague there, who informed him that he was no longer connected with the business and that it had been moved to Lynchburg. Mr. Waff shortly thereafter went to Lynchburg and, being impressed with the stove, discussed with the plaintiff the possibility of having the stove manufactured by established stove manufacturers who could distribute it upon a larger scale. The plaintiff corporation was interested in this and furnished Mr. Waff with descriptive literature and advertising matter; and for the next ten months or a year, Waff seems to have made some efforts to develop the manufacture and sale of the stove, but apparently without results.

During this time Waff continued his acquaintance with Montague and in discussion with him he was told by Montague that he (Montague) was working on a further improvement of the Ashley stove on which he expected to apply for another patent. The Auto Stove Works, the defendant here, was one of the stove manufacturers whose line of stoves Waff was selling; and during the latter part of 1938, Waff brought Montague and the defendant company together with a view to interesting the defendant in the manufacture of a stove equipped with the device which Montague was at that time working on and for which he had applied for a patent, although no patent has as yet issued. As a result of this, the defendant had some stoves equipped with Montague's device and, after trying them out and after other negotiations with Montague, entered into an agreement dated July 1, 1939, in which it is recited that Montague has filed application for a patent on his second device and agrees to give the defendant an exclusive license to manufacture and sell stoves equipped with this device upon a royalty basis. Among other terms of this agreement was one to the effect that if any litigation ensued, either for the protection of rights under any patent that might be granted on this new device or for the defense of any suit brought by third parties against either Montague or the Auto Stove Works, the parties were to share equally the expense of any such litigation. The defendant then embarked on the manufacture of stoves equipped with the device perfected by Montague, and which will hereinafter be referred to as the second Montague device or the infringing device, in order to distinguish it from the previous improvement devised by Montague, the patent on which is owned by the plaintiff.

In the meanwhile, the business of the plaintiff conducted at Lynchburg had met with considerable success and was expanding from year to year; and when the plaintiff became aware in May, 1939, that the defendant was manufacturing and selling stoves equipped with the second Montague device, it gave notice to the defendant of infringement and later instituted this suit, as heretofore related.

The defendant had begun the manufacture and sale of stoves equipped with the second Montague device prior to the date of its formal agreement with Montague. It had been notified in May, 1939, by the plaintiff that the latter considered its stove an infringement of the Ashley patent, and Mr. George P. Wirth, Jr., the secretary and treasurer of the defendant company, who seems to have conducted the negotiations with Montague and on behalf of the company executed the contract with Montague, testifies that at the time of his negotiations with Montague and the entrance into the contract he knew of the Montague patent and that it was owned by the plaintiff. It is apparent, therefore, that on July 1, 1939, when the contract between the defendant and Montague was entered into, the defendant company knew of the existence of both the Ashley and the Montague patents and their ownership by the plaintiff and had previously been notified by the plaintiff that the defendant's stove was an infringement of the Ashley patent. It seems probable that knowledge of the ownership of these two patents and

of the notification of infringement were the causes which induced the inclusion in the contract between Montague and the defendant of the provisions relating to the defense of any suit that might follow.

Mr. Wirth testifies that in acquiring the rights to Montague's second device, the defendant company caused no investigation to be made by lawyers, patent experts or otherwise as to whether the device used by it was an infringement of the patents owned by the plaintiff, but accepted Montague's assurance that it would not infringe and proceeded on that assurance. It develops in the course of the evidence in this case that Montague, in compliance with the terms of his agreement with the defendant, is bearing half of the expense of defending this suit, although it is stated that he has no control over the management or direction of the defense.

It further, appears that since the plaintiff company has become somewhat better established and has resolved its uncertainties with regard to the manufacture of its stove, its business has met with pronounced success. While the corporation is one of limited capital and its manufacturing facilities are somewhat restricted, it appears that for the last three years its business has shown a noteworthy increase from year to year and that the demand for its stoves is greater than it has been able to supply during that period. Dealers in stoves and salesmen who have testified are in agreement that the stove has met with a high degree of popularity, that purchasers are unanimously agreed that the stove is unusually efficient and satisfactory and that it meets a long felt want in the trade. There seems no doubt that a stove manufactured by the plaintiff under the Ashley and Montague patents is a marked commercial success and fills a need which had heretofore been unsupplied. It is testified that it is different from anything previously offered for sale and accomplishes results not heretofore attained. This testimony is in some measure confirmed by that of Mr. Wirth, who in testifying for the defendant, stated that although he had been in the stove manufacturing business for a great many years, he had not before coming in contact with Montague seen any stove of this type nor had he heard of one; and that when he investigated it, he was impressed with its utility and efficiency and desired to add it to the line of stoves which his company was making and selling.

This history of the patents in suit and of the events leading to this litigation has been given in order that it may be understood that the alleged infringing stove was put upon the market by defendant with full knowledge of the existence of the Ashley and Montague patents and in the knowledge that it was considered by plaintiff as an infringement of these patents. The coming into existence of defendant's stove was undoubtedly due to the knowledge of the usefulness and success of the stove manufactured by plaintiff under the Ashley and Montague patents. In other words, the defendant, knowing of the usefulness and success of the stove manufactured by the plaintiff, undertook to manufacture a stove which operated upon the same principles and would meet the same popular demand within the trade. This in itself, of course, does not necessarily constitute infringement or imply that there was any infringement, but where, an alleged infringing device is brought into existence under such conditions and has not been made as a result of independent discovery and without knowledge of the prior existence of a similar device, one is impelled to make close inquiry as to whether or not there was an infringement.

The fact that the alleged infringing device is brought into existence with the knowledge of the patented article and to meet the same demand puts one on inquiry as to whether the infringing device is not a mere imitation of the patented article. It is the contention of the plaintiff that this is the case here and that the alleged infringing device is a mere imitation or duplication of the stoves made under its patent altered in immaterial respects which do not absolve it from infringement. The defendant, on the other hand, contends that its stove does not infringe the claims of either the Ashley or Montague patents. This naturally leads to a consideration of what is covered by these patents and of the nature of defendant's stove.

### The Patents in Suit

The structure shown by the Ashley patent consists of an air-tight, wood-burning stove of what might be called the drum type, with a lid on the top thereof for the feeding of fuel and the ordinary outlet flue for smoke. To this stove Ashley af-

fixed on the exterior a down-draft stack entering the body of the stove near the bottom. At the top of this down-draft stack was a damper fitted into the stack with a thermostatic control element affixed between the top of the down-draft stack and the body of the stove. The thermostatic element, i. e., the element subject to the influence of heat, was a gas filled wafer which contracted or expanded with the rise and fall in temperature and which by such expansion or contraction opened or closed the damper at the top of the down-draft stack through a mechanical connection therewith. There was, of course, no novelty in a wood-burning stove of the type mentioned, but the novelty and utility of the invention was alleged to arise from the application of the other elements described and in the arrangement described, all of which are alleged to have had, a definite purpose. The object of the invention was to obtain a regularity of temperature generated by the fuel in the stove with an absence of marked variations of temperature and to insure that the fuel in the stove would burn slowly and regularly and with a maximum of efficiency. The down-draft stack was applied because of the fact that air fed to the fuel in the stove through a down draft fed into the stove more slowly and evenly and with a less sudden inrush of air than in any other way. The damper was positioned at the top of the stack in order that when the damper was closed, there would be within the stack a column of heated air and upon the opening of the damper this pre-heated air would be fed to the fuel, causing a more prompt and regular combustive response than an inrush of cold air. The thermostatic element was positioned closely to the body of the stove in order that it might be responsive to the temperature of the stove rather than to the temperature of the surrounding room and to air currents affecting the temperature within the room.

While this is not a technical description of the Ashley patent, it is a sufficient description of the general structure of the stove and of its purposes. The results claimed were that this thermostat, responsive to the heat of the stove, became operative at slight changes in the stove heat without regard to the room temperature and that consequently the damper in the stove, being responsive to the thermostatic control, opened or closed with small variations of heat, thereby enabling the draft to respond promptly to minor variations of heat and thus insuring a comparatively even temperature being maintained at all times; that with the opening of the damper, the pre-heated air in the down-draft stack was fed by draft to the fuel and that combustion within the stove picked up more promptly and was continued more evenly than with any other form of draft, the general results being that the stove gave a maximum degree of heat from the fuel consumed and that this fuel was consumed with such slowness and regularity as to require infrequent refueling and a minimum consumption of such fuel as was used; that these results were accomplished seems evident from experiences had with the stove in actual operation.

All of the general features of the stove as constructed by Ashley and its method of operation are retained in the Montague patent. What Montague did was to substitute for the wafer thermostat a rigid bi-metallic strip as the element responsive to heat changes, making also some change in the mechanical connection between this bi-metallic strip and the damper. He also inclosed the damper and the thermostatic element in a cap or housing over the upper end of the down-draft stack. The purpose of this latter change was to exclude still further the influences of room temperature and air currents upon the thermostat and to make it as nearly as possible responsive to the radiant heat of the stove.

The defenses urged in this case, as in most patent cases, are those of the invalidity of the Ashley and Montague patents and also non-infringement of either of the patents. Before the introduction of any evidence attacking the validity of the Montague patent, the plaintiff objected to the introduction of such evidence on the ground that Montague himself was estopped to deny the validity of a patent which he had obtained and which had been assigned by him to the plaintiff and that because of the privity of relationship between Montague and the defendant, the defendant was likewise estopped. The Court took this motion under consideration and allowed the evidence to proceed. Upon consideration, I am of opinion that the motion is well taken. There is no doubt of the fact that an assignor of a patent is estopped to deny its validity. See Westinghouse Electric & Mfg. Company v. Formica

Insulation Company, 266 U.S. 342, at page 349, 45 S.Ct. 117, 69 L.Ed. 316, and the cases there cited.

It is shown in this case that the defendant is manufacturing its stove under a license with Montague and that Montague has agreed to bear half of the expense of any litigation resulting from the manufacture of this stove and that he is, in fact, doing so. Without further discussion, it seems to me that the situation comes within the doctrine laid down by the cases of Continental Wire Fence Co. v. Pendergast, C.C., 126 F. 381; Leader Plow Company v. Bridgewater Plow Co., 4 Cir., 237 F. 376, and other cases of like type, and that the defendant is likewise estopped from attacking the validity of the Montague patent.

This fact is, however, not of great importance in this case because the Ashley patent is really the basic patent in this case and it is not contended that any estoppel exists as to it, and it is, of course, true that the defendant is in no way affected in his rights to claim non-infringement of either patent.

On the question of infringement, there must be first considered just what the defendant's stove consists of; wherein it differs in structure or operation from that of the plaintiff. The defendant has used an air-tight, wood-burning stove similar to that of the plaintiff, and probably of many other manufacturers, with the usual lid on top for the introduction of fuel and the usual smoke pipe. It has used a down-draft stack exterior to the body of the stove with a damper on the top of this down-draft stack. The down-draft stack is shorter than that in the plaintiff's stove and the thermostatic element is not located in the top of the down-draft stack as in plaintiff's stove. On the contrary, the thermostatic element in defendant's stove is placed within a separate housing affixed to the side of the stove near its top and some three inches above the top of the down-draft stack. The damper at the top of the down-draft stack is connected with the thermostat by a chain extending from the damper to the thermostatic element. In other words, in plaintiff's stove, the down-draft stack extends from the bottom of the stove substantially to the top of the stove, with the thermostat and damper located inside of the top of the down-draft stack; while the defendant has shortened the down-draft stack and placed its thermostat in a separate housing at the top of the stove some three inches above the damper in the top of its down-draft stack, and has connected the thermostat and the damper by a chain.

Both stoves have means for manual operation of the damper and for regulating or setting the thermostatic element. The principles of operation of the two stoves are the same, the only difference being in regard to the form of structure and the fact that defendant's thermostat is positioned above the down-draft stack instead of within the top of it and that the connection between the damper and the thermostat in defendant's stove is by means of a chain, while that in the plaintiff's stove is by a rigid push rod. There is no doubt that defendant's structure is designed to and does accomplish the same results as that of the plaintiff, and there is no denial of this fact.

The serious question on the issue of infringement involves the meaning and extent of the claims of the Ashley and Montague patents. The alleged infringement is based upon claims one and two of the Ashley patent and claims three and four of the Montague patent, which are as follows:

Claims 1 and 2 of Ashley.

"1. The combination with an air-tight stove having a down draft pipe extending along the side thereof and spaced therefrom, an automatic damper control secured to the stove and having a cap embracing the upper end of the down draft pipe, a damper carried thereby and adapted to automatically control the down draft in said pipe.

"2. The combination with an air-tight stove having a down draft pipe extending along the side thereof and spaced therefrom, an automatic damper control means secured to the wall of the stove and having a cap embracing the upper end of the pipe and provided with an opening, a damper controlling said opening and operated by the automatic control between the stove and the pipe."

Claims 3 and 4 of Montague:

"3. In combination, a wood-burning stove of the class described, said stove having a down-draft inlet stack extending adjacent to a wall portion of the stove, a damper for effecting the control of air through said down-draft stack, a housing against the stove and adjacent said stack

constituting a chamber formed so as to exclude room air currents and positioned with respect to the stove to receive radiant heat therefrom, a thermostat positioned interiorly of said chamber so as to be responsive substantially solely to radiant heat from said stove, means interconnecting said thermostat and said damper, and means manually adjustable exteriorly of said housing acting through said thermostat for adjusting the setting of the thermostat to control the draft through the stove.

"4. In combination, a wood-burning stove of the class described, said stove having a down-draft inlet stack adjacent to a wall portion of the stove, a damper for effecting the control of air through said down-draft stack, means constituting a chamber adjacent said stack formed so as to exclude room air currents from the chamber and positioned closely adjacent said stove so as to receive radiant heat therefrom, a thermostat positioned in said chamber so as to be responsive substantially solely to radiant heat from said stove, means interconnecting said thermostat and said damper, and means manually adjustable for varying the setting of the thermostat-damper to control the draft through the stove."

Quite a good deal of the evidence in the case was devoted to an interpretation of these claims and the history of these patents as shown by the records of the Patent Office was elaborately discussed by experts for both parties, who expressed sharply differing conclusions.

■ Conceding the fact that the history of a patent through the Patent Office may be introduced · showing the rejection of claims originally made and the amendment of other claims all for the purpose of interpreting the extent of the claims as finally allowed, the fact remains that the claims as finally allowed speak for themselves where they are in plain language and the interpretation of this language is not in doubt. Goodyear Dental Vulcanite Co. v. Davis, 102 U.S. 222, 227, 26 L.Ed. 149. The evidence included the introduction of a number of prior patents and other disclosures showing the state of the prior art and all designed to show that all of the elements of the Ashley patent were known in the prior art and had long been used and practiced. There is no doubt that air-tight, wood burning stoves have been in long use; that down-draft pipes both on the interior and exterior of stoves have

been used; that thermostatic damper controls have been used on stoves and furnaces and, in fact, most of the elements involved in the Ashley structure have been the subject of numerous prior patents and have been practiced and used in one form or another in many heating devices; but the Ashley patent is for the combination of elements as set out in the claims allowed, and there is shown no structure in the prior art which combined these various elements in the manner of the Ashley structure or that obtained the same results obtained thereby.

■ The examiners in the Patent Office, with their extensive knowledge and opportunities for research, found nothing which they considered to anticipate this combination and considered it patentable. Witnesses of long experience and knowledge in the manufacture of stoves, including a representative of the defendant itself, have testified that the combination shown is something new in stove construction and accomplishes results not heretofore attained. The fact that each of the elements entering into the combination may have been long known and that their combination or assembly may have been merely a mechanical construction composed of well known parts does not affect the novelty involved in the combination. To take known elements and combine them into a structure novel in character and accomplishing results not theretofore obtained is as much invention as the conception of the individual elements. The argument which defendant so strongly urges, that there is a lack of invention due to the fact that every element in the Ashley stove has been anticipated in the prior art and has been taught by other structures, is at least partly answered by the fact that when the Ashley stove came upon the market it was a structure entirely new to the defendant itself; that all of the teaching of the prior art had never taught the defendant to make any such structure, although it had been in the stove manufacturing business for a great many years; that when the combination of elements involved in the Ashley stove did come to its attention, it seized upon it as something new in the business and as an advancement of great usefulness.

While the various elements going to make up the completed Ashley stove have been long known and used in various forms, he so combined and positioned them in

their relation to each other as to bring about a structure having no counterpart in the prior art and accomplishing results not theretofore obtained.

In Denning Wire, etc., Co. v. American Steel, etc., Co., 8 Cir., 169 F. 793, 801, the rule is stated: "A new combination of old elements or devices, whereby a new and useful product is produced, or an old product is attained in a more efficient and economical way, may be * * * protected by patent."

And in Ottumwa Box Car Loader Co. v. Christy Box Car Loader Co., 8 Cir., 215 F. 362, 369: "It constitutes no anticipation and no defense to a claim of infringement that one or more elements of a patented combination, or one or more parts of a patented improvement, may be found in one old patent or publication, and others in another, and still others in a third. It is indispensable that all of them, or their mechanical equivalents, be found in the same description or machine, where they do substantially the same work by the same means."

The use of stoves is an old art; their manufacture has been a large industry and their use extensive for many generations. Efforts to increase their efficiency in simplicity of operation, freedom from manual attention, conservation of fuel and in other ways have not been neglected. The fact that in this crowded field one has devised a stove which accomplishes new and beneficial results in a manner not previously utilized indicates in itself that the element of invention was involved in the structure. And when it is apparent (as is here) that the stove has a high degree of utility and has met with a success which has caused others to imitate it and to seek entrance to the same commercial field appropriated by it, then the evidence of patentable novelty and utility becomes even stronger. See McKee et al. v. Graton & Knight Co., 4 Cir., 87 F.2d 262; Kurtz v. Belle Hat Lining Co., 2 Cir., 280 F. 277; Montgomery Ward & Co. v. Gibbs, 4 Cir., 27 F.2d 466; Temco Electric Motor Co. v. Apco, etc., Co., 275 U.S. 319, at page 324, 48 S.Ct. 170, 72 L.Ed. 298.

■ The grant of a patent is presumptive evidence of its validity, American Sulphite, etc., Co. v. De Grasse Paper Co., 2 Cir., 157 F. 660, at page 663; Walker on Patents, 6th Ed., § 535, and one who asserts the contrary must overcome this presumption by proof. This the defendant has undertaken by offering evidence of the prior art in the form of prior patents and other public disclosures. But, as previously stated, I am of opinion that none of these anticipate or disclose the combination of elements shown by Ashley. As said in Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, at page 434, 31 S.Ct. 444, at page 447, 55 L.Ed. 527: "It was certainly not an exact repetition of the prior art. It attained an end not attained by anything in the prior art * * *. It possesses such amount of change from the prior art as to have received the approval of the Patent Office, and is entitled to the presumption of invention which attaches to a patent."

Issues in most law suits are not of a nature that can be solved with an exactitude that admits of no variation. They are not mathematical problems to which formulas can be applied with the result of arriving at an exactly precise answer; and to which any other answer is wrong. And patent cases are no exception. There is no formula or theorem which determines with indisputable precision whether a patent is valid or not. But when to the presumption of validity arising from its issuance we add the facts of utility, of noteworthy success in a crowded field, and of imitation by others, the evidence is very strong that the patentee has produced something which, by all usual tests, is patentable. See Kurtz v. Belle Hat Lining Co., 2 Cir., 280 F. 277; Montgomery Ward & Co. v. Gibbs, 4 Cir., 27 F.2d 466, at page 470; McKee v. Graton & Knight, 4 Cir., 87 F.2d 262, at page 264.

■ I am, therefore, of opinion, and so find, that the Ashley patent (No. 1,-786,931) is valid.

### The Question of Infringement

The claims of the Ashley patent have heretofore been set forth as has also a general, though technically imperfect, description of the structure. It has also been pointed out that the structure called for by Montague's patent (No. 2,170,728) shows a modification of the Ashley structure in that the thermostatic element is changed from a wafer type to a rigid bi-metallic element and the thermostat is surrounded or covered by a cap or housing in order to exclude room air currents and confine the thermostat, as nearly as possible, to responding only to the stove heat. Whether the structure of the Montague patent involves elements entitling it to

patentability, in view of the prior ·disclosures of Ashley, is a matter about which doubts may arise. But, as I have previously held, the defendant is estopped to deny the validity of the Montague patent; and the defendant's structure, if it infringes, infringes the Ashley patent as well as that of Montague.

The defendant's structure professes to go forward from the Montague patent; that is, it adopts the essential changes which Montague made over Ashley, namely, the bi-metallic thermostatic element and the housing over the thermostat, and altered the form of certain elements and their arrangement. The changes made have previously been described. They consist in shortening the down-draft stack so that the thermostat is no · longer in the top of the stack but is positioned a few inches above the upper end of the draft stack and connected with it by a chain; the bi-metallic element is in the form of a coil or helix instead of a straight strip; and the connection between the thermostat and the damper is by means of a chain instead of a rod. The improvements which the Montague patent made over Ashley are still retained in defendant's ·structure, i. e., the bi-metallic thermostatic element and the housing over the thermostat. Just what novelty or improvement is embodied in defendant's structure which is claimed to differentiate it from the Montague patent, to the point of non-infringement, is not clear. It is stated that Montague now has pending an application for a patent on this second device of his now represented by defendant's structure. But the application has not been put in evidence and the nature of the claims set forth in it are not recited. In his oral testimony, Mr. Montague says that there were two defects in his patented structure, (1) that the damper opened by gravity and (2) that the location of the thermostat led to a long cycle of operations; which defects he has remedied in the structure used by defendant. He is vague and not convincing, however, in explanation of just how the supposed defects will be remedied or bettered by his new structure or whether they will, in fact, improve the operation of the stove. In any event, he claims no difference in principle of operation or, so far as I could see, anything more than that his rearrangement of the position of certain parts would make the stove operate more satisfactorily. The success-

ful operation of plaintiff's stove in actual use and its growing sale over a period of three or four years would argue that it has no serious defect. Conceding that most mechanical devices are the subject of improvement from time to time by the rearrangement or adjustment of parts or the use of better materials, such changes are not necessarily patentable inventions merely because they are changes; and this is more assuredly so in the absence of proof that they effect · any improvement in results.

It is plain, I think, that not only are plaintiff and defendant seeking exactly the same results, but are seeking it by structures which are identical in principle and method of operation and which differ in no material respect in their component parts. The most that can be said for defendant is that, in the hope of obtaining better results, it has arranged the component parts of the structure in somewhat different form from the arrangement used by plaintiff.

It may be noted that the defendant makes no contentions that its use of a helical form for its bi-metallic thermostatic element or the use of a chain connection between the thermostat and the damper are such modifications as to avoid infringement. But it points to the claims of the Ashley patent which refer to a draft stack extending along the ·side of the stove and spaced therefrom, to a cap embracing the upper end of the down-draft pipe, and an automatic control between the stove and the pipe. It contends that the Ashley patent is limited to a structure in this particular form and that defendant's structure does not include these features. It should first be pointed out that the claims of the Montague patent are not limited to the form of structure thus emphasized; so that, even if defendant, by its change in the form of structure, is enabled to avoid infringement of Ashley it would, I think, still infringe the Montague patent, whose claims clearly cover defendant's structure.

■ But I do not think that defendant has succeeded in avoiding infringement of the Ashley patent. The modifications made are merely changes in the location of certain component parts with relation to others, with no change in the essential form of the structure and its method of operation. It is well settled that infringement is not avoided by mere changes in

form or in the positioning of parts, where the method of operation and results are the same and the parts perform the same function in relation to each other.

In Union Paper Bag Machine Co. v. Murphy, 97 U.S. 120, at page 125, 24 L.Ed. 935, it is said:

"Except where form is of the essence of the invention, it has but little weight in the decision of such an issue, the correct rule being that, in determining the question of infringement, the court or jury, as the case may be, are not to judge about similarities or differences by the names of things, but are to look at the machines or their several devices or elements in the light of what they do, or what office or function they perform, and how they perform it, and to find that one thing is substantially the same as another, if it performs substantially the same function in substantially the same way to obtain the same result, always bearing in mind that devices in a patented machine are different in the sense of the patent law when they perform different functions or in a different way, or produce a substantially different result.

"Nor is it safe to give much heed to the fact that the corresponding device in two machines organized to accomplish the same result is different in shape or form the one from the other, as it is necessary in every such investigation to look at the mode of operation or the way the device works, and at the result, as well as at the means by which the result is attained.

"Inquiries of this kind are often attended with difficulty; but if special attention is given to such portions of a given device as really does the work, so as not to give undue importance to other parts of the same which are only used as a convenient mode of constructing the entire device, the difficulty attending the investigation will be greatly diminished, if not entirely overcome. Cahoon v. Ring [Fed.Cas. No. 2,292], 1 Cliff. 620.

"Authorities concur that the substantial equivalent of a thing, in the sense of the patent law, is the same as the thing itself; so that if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape. Curtis, Patents (4th Ed.), sect. 310."

In National Hollow Brake-Beam Co. v. Interchangeable Brake-Beam Co., 8 Cir.,

106 F. 693, at page 711, it is said: "Mere changes of the form of a device or of some of the mechanical elements of a combination secured by patent will not avoid infringement, where the principle or mode of operation is adopted, unless the form of the machine or of the elements changed is the distinguishing characteristic of the invention." And see Hartford-Empire Co. v. Swindell Bros., 4 Cir., 96 F.2d 227, at page 231; Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, at page 42, 50 S.Ct. 9, 74 L.Ed. 147; Winans v. Denmead, 15 How. 330, 338, 14 L.Ed. 717; Columbia Wire Co. v. Kokomo Steel, etc., Co., 7 Cir., 143 F. 116, at page 122; Hoyt v. Horne, 145 U.S. 302, at page 309, 12 S.Ct. 922, 36 L.Ed. 713; Western Electric Co. v. La Rue, 139 U.S. 601, 11 S.Ct. 670, 35 L.Ed. 294; Ives v. Hamilton, 92 U.S. 426, at page 430, 23 L.Ed. 494.

It is said in Seymour v. Osborne, 11 Wall. 516, 517, 20 L.Ed. 33, that "A question of infringement is best determined by the court, by a comparison of a defendant's machines with mechanism described in patent, and of their modes of operation."

And in Denning Wire & Fence Co. v. American, etc., Co., 8 Cir., 169 F. at page 806, we find the following: "The correct rule being that, in determining the question of infringement, the court or jury, as the case may be, are not to judge about similarities or differences by the names of things, but are to look at the machines or their several devices or elements in the light of what they do, or what office or function they perform, and how they perform it, and to find one thing is substantially the same as another, if it performs substantially the same function in substantially the same way to obtain the same result, always bearing in mind that devices in a patented machine are different in the sense of the patent law when they perform different functions or in a different way, or produce a substantially different result. Nor is it safe to give much heed to the fact that the corresponding device in two machines organized to accomplish the same result is different in shape or form the one from the other, as it is necessary in every investigation to look at the mode of operation or the way the device works, and at the result, as well as at the means by which the result is attained."

In the instant case, the Court has had before it for examination the stoves of both parties and has carefully studied

the patents of plaintiff, as well as having heard detailed explanations of both stoves and patents by witnesses. I cannot escape the conclusion that the stoves operate on an identical principle by use of the same component elements and that defendant's structure represents merely changes in the arrangement of parts or the substitution of minor mechanical arrangements; that it is in every essential respect an imitation, amounting practically to a copy, of plaintiff's structure. Whether the modifications made were in the hope of avoiding infringement or in a sincere belief that improvement in the operation of the stove was being made, is not material. In either case the infringement is plain. To paraphrase the language of Mr. Justice McKenna in Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. at page 441, 31 S.Ct. at page 450, 55 L.Ed. 527, the defendant "gives the tribute of its praise to the prior art; it gives the [defendant's stove] the tribute of its imitation."

If there were room for doubt, the conditions under which defendant's stove came into existence would weigh strongly in favor of a judgment of infringement. The fact that defendant, an established stove manufacturer, had its attention called to plaintiff's stove and found it a new structure which it desired to add to its line; that it contracted with Montague, a previous employee of plaintiff who had severed his connection with plaintiff under hostile conditions, to devise for defendant a stove operating on the same principle; that its contract with Montague indicates the thought of a possible charge of infringement—all of these are facts, which, as said by Judge Northcott in Montgomery Ward & Co. v. Gibbs, 4 Cir., 27 F.2d at page 470 [last paragraph], bring into the case an element which a court of equity considers with seriousness.

I have heretofore held that, because of the relationship between Montague and the defendant, the latter is estopped to deny the validity of the Montague patent; but even in the absence of such relationship, it would have to be held that the Montague patent is valid as against the defendant. If this were a contest between the Ashley patent, and the Montague patent, there would be doubt in my mind as to the validity of the latter because of its possible anticipation by Ashley. But both patents are owned by the plaintiff and it is entitled to be protected against infringement of either. Defendant's structure is probably a closer imitation of the structure shown in the Montague patent than of that shown by Ashley. If, as an independent proposition, we were to hold the Montague patent valid as embodying patentable improvements over Ashley, then defendant has undoubtedly infringed the Montague patent. On the other hand, if the Montague patent is invalid as contributing nothing of invention beyond what Ashley had previously shown, then defendant's structure is equally anticipated by Ashley. Since I have held that the defendant has infringed the Ashley patent, it has likewise and even more clearly infringed the Montague patent.

In view of the conclusions reached, it is obvious that defendant's counter-claim is without merit.