THURBER CORPORATION, Appellant,

v.

FAIRCHILD MOTOR CORPORATION
and Ford Motor Company,
Appellees.

No. 16938.

United States Court of Appeals
Fifth Circuit.

July 24, 1959.

Rehearings Denied Sept. 30, 1959.

Edmund C. Rogers, Lawrence C. Kingsland, St. Louis, Mo., Malcolm W. Monroe, New Orleans, La., Deutsch, Kerrigan & Stiles, New Orleans, La., Kingsland, Rogers & Ezell, St. Louis, Mo., Eberhard P. Deutsch, Bernard Marcus, New Orleans, La., of counsel, for appellant.

Arthur W. Dickey, Detroit, Mich., Harry McCall, Jr., New Orleans, La., Robert G. Harris, Dearborn, Mich., Chaffe, McCall, Phillips, Burke & Hopkins, New Orleans, La., Cyrus G. Minkler, Harness, Dickey & Pierce, Detroit, Mich., of counsel, for defendants-appellees.

Before JONES, BROWN and WISDOM, Circuit Judges.

1. The patents have been conveniently designated by their last three digits. Thus, the numbers used here correspond to, respectively, 2,045,500; 2,292,253; 2,613,772; 2,613,549; and 2,613,550.

2. The apparent record presentation of this general point is far from perfect. We have, however, with the aid of post argument memoranda and much effort, satisfied ourselves that the position of Thurber was sharply brought to the Court's attention and by it articulately rejected. The Court had initially excluded some of it altogether, had tentatively ruled that other portions were admissible for limited use, but later declined to permit introduction of any. In view of this Thurber did not have to reoffer it formally at the several stages when introduction would have been pertinent. Thurber was entitled to accept the Court's ruling at face value under the Rules, F.R.Civ.P. 46, 28 U.S.C.A.

JOHN R. BROWN, Circuit Judge.

This is a patent case involving the validity and infringement of five patents relating to automobile transmissions. Thurber complains that his 500 and 253 patents (issued 1936 and 1942) were infringed by the Ford overdrive transmission, and that his 772, 549 and 550 [1] (issued ten years later) were infringed by the Fordomatic transmission. The jury thought otherwise, verdict and judgment were accordingly entered for defendant-Ford, and Thurber appeals.

Unlike the usual patent case, however, we need consider neither the mechanics of these complex devices nor involved questions of patent law.

Thurber's complaints are limited to the exclusion of evidence relating to the so-called "Borg-Warner story," and the Court's charge.

## I.

### The Borg-Warner Story

The so-called Borg-Warner story, which was excluded from evidence by the District Court,[2] is simply an explanation of the dealings between Thurber and Borg-Warner and the subsequent relations between Borg-Warner and Ford. Its highlights—either undisputed or by permissible jury inferences—may be swiftly summarized.

*Overdrive.* Thurber has been working in the automotive industry for over fifty years, and with transmissions since the late 1920's. He filed his 500 patent in 1934 and his 253 patent in 1938. Borg-Warner had been working on a similar project. Thurber disclosed his 500 patent to them in 1934 and later his 253.

Thurber claims that the Borg-Warner overdrive manufactured in 1948 or 1949, and used by Ford, infringed the inventions he had previously disclosed to them.

*Fordomatic.* Thurber's 772, 549 and 500 patents were pending in 1946 when Borg-Warner was trying to design a transmission to compete with Hydramatic. Thurber went over his applications with Borg-Warner's designers at that time. What Ford subsequently used as the "Fordomatic" was obtained from Borg-Warner in 1949, and was, Thurber asserts, an infringement of his patents previously disclosed to Borg-Warner.

Borg-Warner paid a total of $10,000 for two six-months' options to license Thurber's patents in 1950. This was dropped upon the insistence of Ford that it might appear to be a recognition of patents.

But during this time Borg-Warner's patent attorneys had apparently aided Thurber somewhat in perfecting the language of the claims now in suit so that they would read on the Fordomatic device.

*Litigation Agreement.* Borg-Warner and Ford negotiated a division of expenses agreement as to any Fordomatic litigation, an indemnity agreement as to the Fordomatic sold by Borg-Warner to Ford, and an indemnity agreement as to overdrives. Borg-Warner further aided Ford by providing Wayman and Barnes as expert witnesses.

Thurber proffered, as exhibits, correspondence between Thurber and Borg-Warner as to the patent and license negotiation, and correspondence and agreements between Ford and Borg-Warner regarding litigation agreements. The Court ruled on this proffer at the outset of the trial: (1) all the Thurber/Borg-Warner correspondence was to be admitted on the question of validity (though not on the question of infringement), and (2) none of the Borg-Warner/Ford material was to be admitted. Subsequently all was excluded.

We conclude that this ruling, and the subsequent total exclusion by the Court, were erroneous, and accordingly hold that a new trial must be granted.

The effect of this exclusion cannot be fully estimated. We cannot now determine what the jury might have done had it known what it was not permitted to know. But the matters excluded were of such great significance and pertinence to the case at hand that we cannot say that the District Court's ruling did not "affect the substantial rights of the parties," 28 U.S.C.A. § 2111, or that it constituted mere "harmless error," F.R.Civ. P. 61.

Witnesses Barnes and Wayman gave a substantial quantity of testimony, together comprising nearly 500 pages of printed record. Barnes was a regular consultant to Borg-Warner and received royalties from it on several devices. Wayman was in its direct employment and his presence there was in aid of the mutual defense to which Borg-Warner and Ford were bound. Of necessity, the jury was entitled to place considerable reliance upon their explanations of overdrive and automatic transmissions, the interpretation and meaning of the patent claims, and their general conclusions that there was no equivalence between the Thurber and Ford devices. Thurber was entitled, and permitted, to demonstrate to the jury that these men were effectually or actually employed by Borg-Warner, and that Borg-Warner was making the transmissions for Ford. But the Court's ruling concealed from the jury the significant additional facts underlying the Borg-Warner/Ford relationship. These relate to[3] the Ford/Borg-Warner agreement to share litigation expenses and Borg-Warner's agreement to indemnify Ford for any infringement liability incurred connected with the Borg-Warner

---

3. These included Exhibits 247 through 247–R, comprising correspondence between Ford and Borg-Warner as to nature and extent in percentage of sales volume, etc., of indemnity by Borg-Warner to Ford, and vice versa, and the final indemnity and the expense sharing agreements. Exhibits 249–253.

transmissions. It is axiomatic that their employment by someone with such a direct interest in the outcome of the case is a fact that the jury should know in weighing their testimony.

■ "Under this rule the fact that a witness is employed by a party to the suit is regarded as a relevant circumstance to be considered by the jury as showing bias or interest, and a fortiori where the witness is an employee of a party who has an interest in the recovery, his employment may be shown for the same reason." Majestic v. Louisville & N. R. Co., 6 Cir., 1945, 147 F.2d 621, 627. See generally McCormick, Evidence § 40 (1954); 3 Wigmore, Evidence §§ 948, 949 at 500–01, 966, 969 (3rd ed. 1940). To this must be added the further *a fortiori* that the financial interest of the witness' *employer* may be shown to connect the chain. That is what this evidence did in a graphic way.

■ The testimony of these experts was in the field of opinion on which credibility is not a mere matter of truth or falsity. How far did the fact that Wayman's employer would have to indemnify Ford fully for damages awarded Thurber for transmissions sold by Borg-Warner affect his opinion on the interpretation of this abstruse language, the equivalence of the devices and the like? Without this information the jury was weighing the intrinsic value of his testimony in ignorance of highly relevant factors.

In addition to this impeachment evidence we think the Court erred in excluding as irrelevant the proffered evidence of correspondence, etc., between Thurber and Borg-Warner. As background the record authorized the jury to infer that Ford would not have been using the Fordomatics apart from Borg-Warner, i. e., that Borg-Warner had an actual operational responsibility for Ford using this particular device. Quite apart from questions which might arise about Borg-Warner being an "agent" of Ford, it is clear that it was no stranger to Ford in this situation. Since Ford got the device from Borg-Warner, it was certainly relevant to consider what Borg-Warner had done. Especially would this be so as between Borg-Warner and Thurber.

The evidence [4] proffered in this category warranted a jury inference that Borg-Warner had access to Thurber's secrets. That might have been deemed relevant in drawing the further inference that Borg-Warner came to design its Fordomatic, not as it and Ford claims from the prior art, but rather from the teachings of Thurber's patents and disclosures.

■ Of course it is true that the determination of the validity and infringement of a patent can be made irrespective of the purpose and intent of the alleged infringer, and that it is not necessary that he even have knowledge of the patent alleged to be infringed. Eastman Oil Well Survey Co. v. Sperry-Sun Well Surveying Co., 5 Cir., 1942, 131 F.2d 884, 887; Kansas City Southern Ry. v. Silica Products Co., 8 Cir., 1931, 48 F.2d 503, 508; 3 Walker, Patents §§ 450 at 1681–82, 453 (Deller's Ed. 1937).

Nevertheless, courts are not blind to these factors, and they should not insist that juries be. Many cases can be found in which the courts have taken special note of the fact that the alleged infringer had opportunity or reason to make a conscious appropriation of the patent in question. Only a few need be cited.

For example, quite recently in Bryan v. Sid W. Richardson, Inc., 5 Cir., 1958, 254 F.2d 191, we made these observations:

"At the outset, we affirm as clearly supported both the implication and the express holding that Bryan's device is traceable in fact directly to these patents. * * * He had, in the meantime, also obtained in 1952 shop drawings in connection with the settlement of a license dispute. In-

4. This includes Exhibits 168–172, 221–225, 87–99, 226–243, and 248, comprising correspondence between Thurber and Borg-Warner, showing disclosures to Borg-Warner, the making of the option agreements, etc.

deed, it goes even farther back for in 1948 he received, although he later made a denial which the Court discredited, * * * original drawings from McGowen. This was followed by several conferences with McGowen at Bryan's shop in Fort Worth where, at first, he encouraged these young men to work out an arrangement with him, although later, by a change of tune, he began to suggest that their device was of little value if it were not an infringement of some of his own existing patents.

"There was nothing to suggest, indeed much contradicted it, that Bryan at any of these times had conducted any research or experiments which led him to this discovery. He got by taking, not inventing.

* * * * * *

"The Court had more than an ample basis for concluding in fact that Bryan took not only the idea but the means of accomplishment, and that his skill was directed toward contriving a mechanism which appeared to be, but was not in fact, different than 162 or 903. There it ends." 254 F.2d 191, 196, 197–198.

And in Robertson Rock Bit Co. v. Hughes Tool Co., 5 Cir., 1949, 176 F.2d 783, this Court felt it significant similarly to note that,

Defendant Robertson's testimony as to his knowledge of, and acquaintance with, Hughes' patents * * makes it clear that the twin like resemblances between plaintiff's and defendants' structures was not accidental. Indeed, the points of difference relied on by appellants as saving their structure from infringement are so finely drawn, so immaterial, so lacking in substance, such hair splitting as to be no more than camouflage to conceal or soften the starkness of appellants' deliberately planned piracy in the event the legal opinion on which they acted was not correct and it should turn out that the copied structures were not in the public domain." 176 F.2d 783, 786.

District Judge Paul said this by way of conclusion in Automatic Draft & Stove Co. v. Auto Stove Works, D.C.W.D.Va. 1940, 34 F.Supp. 472,

"If there were room for doubt, the conditions under which defendant's stove came into existence would weigh strongly in favor of a judgment of infringement. The fact that defendant, an established stove manufacturer, had its attention called to plaintiff's stove and found it a new structure which it desired to add to its line, that it contracted with Montague, a previous employee of plaintiff who had severed his connection with plaintiff under hostile conditions, to devise for defendant a stove operating on the same principle; that its contract with Montague indicates the thought of a possible charge of infringement * * * bring into the case an element which a court of equity considers with seriousness." 34 F.Supp. 472, 482, and see 34 F.Supp. at page 475.

And as to the specific relation of all of this to the case before us we cannot ignore the Court's charge. Although this is discussed more fully in Part II, infra, it is relevant to point out here that the Jury was specifically directed to consider whether or not Borg-Warner and Ford had looked to Thurber's patents in constructing their own overdrive and automatic transmission. The Court charged:

"In the last analysis, you must use your common sense. * * * In using your common sense you may ask yourselves: Did the Defendant [Ford], in building the Fordomatic transmission, draw on the Hydramatic or other prior art which had been in public use for many years, and was available to it? Or, did the Defendant [Ford] go to the protected Thurber patent and build a transmission based on their specifications and drawings? As to the Overdrive, you may ask yourselves: did the defendant [Ford] go to the Barnes, Winther, Maurer, and Webb patents, if you find that they are in the prior

art, which show in whole or in part the overdrive transmission using a Pawl and Sun Gear Control Plate and a Balk ring? Or, did the Defendant [Ford] go to the Thurber patents, which on their face do not show these things. The answers to these questions and other common sense approaches which you may devise for yourselves will assist you in arriving at your verdict in this very complicated case."

There was thus the unusual combination of the Court having first refused to allow Thurber to show to the jury the very close contact with Borg-Warner had had with the Thurber patents, and then giving a charge in which the jury was almost required to find a direct copying in order to find infringement.

We need not belabor the point, but simply cite these additional cases as further examples. Temco Electric Motor Co. v. Apco Mfg. Co., 1928, 275 U.S. 319, 328, 48 S.Ct. 170, 72 L.Ed. 298 (Ford's shock absorbers); Livesay Window Co. v. Livesay Industries, Inc., 5 Cir., 1958, 251 F.2d 469, 475–476; Matthews v. Koolvent Metal Awning Co., 5 Cir., 1946, 158 F.2d 37, 39; Montgomery Ward & Co. v. Gibbs, 4 Cir., 1928, 27 F.2d 466, 470, certiorari denied, 1928, 278 U.S. 630, 49 S.Ct. 29, 73 L.Ed. 548.

The evidence was relevant and not inadmissible for irrelevancy. It reflected the relationship out of which Ford got the benefit of Thurber's disclosures, if that occurred as Thurber claimed. Borg-Warner was certainly at the heart of the Fordomatic, and Thurber was entitled to show all of the circumstances by which Fordomatic, at the heart, encompassed Thurber's ideas, too.[5]

## II.

### The Court's Charge

While the discussion in Part I above, relating to the exclusion of evidence, effectively disposes of this appeal and is the basis for our judgment reversing and remanding the case for a new trial, as the case is to be tried over again we consider it appropriate to express our views on other points raised by Thurber on this appeal insofar as they present matters which might arise again. Briefly, his other points are limited to the Trial Court's charge. While we consider none of these to be of sufficient merit to warrant a new trial, we make a few comments to avoid inaccuracies or possibly erroneous implications of some parts of the charge when broken down into its many parts.

*Range of Equivalents.* Thurber also complains of the following excerpt from the Court's charge:

"A pioneer patent, one that is broadly new and in a new field, is entitled to a wide range of equivalents in determining infringement. But where, as here, you are dealing with a combination patent in a very crowded transmission art, the claims in suit may be limited through a very narrow range of equivalents because in determining equivalency, the patent, the prior art and the particular circumstances of the case must be considered."

The Court was certainly entitled to consider that this was a crowded art and so instruct the jury. In the face of that, Thurber cannot contest that the range of equivalents accorded a patent does vary with the degree of invention and the quantity of prior art. See gen-

---

5. Thurber could have identified and authenticated all of his correspondence to Borg-Warner. Borg-Warner's letters to Thurber, while relevant, may not have been admissible standing alone. No agency was established so they were not admissions as such. We point this out in view of the imminence of a retrial. We have passed only on relevance which was the basis for exclusion. The option agreement and covering letter (Exhibit 248) are relevant in showing this relationship and are admissible to establish what the option agreement provides, including a disavowal of confidential relationship, a non-waiver of rights or defenses by either Thurber or Borg-Warner, etc.

erally Graver Tank & Mfg. Co. v. Linde Air Products Co., 1949, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097; Sanitary Refrigerator Co. v. Winters, 1929, 280 U.S. 30, 42, 50 S.Ct. 9, 74 L.Ed. 147; Eibel Process Co. v. Minnesota & Ontario Paper Co., 1923, 261 U.S. 45, 63, 43 S.Ct. 322, 67 L.Ed. 523; Continental Paper Bag Co. v. Eastern Paper Bag Co., 1908, 210 U.S. 405, 415, 28 S.Ct. 748, 52 L.Ed. 1122; 3 Walker, Patents §§ 473–475 (Deller Ed. 1937).

■ *Description of accused devices.* Thurber complains that the Court's charge was incorrect in requiring the jury to find as a prerequisite to infringement that the infringed device must be such that it could have been *constructed* by an examination of the Thurber patents. This was expressed, in one way or another, no less than six times in the Court's charge. The Court stated Ford's contentions to be that there could be no infringement if "one could not learn from the drawings and specifications of the patent how to make and use the overdrive transmission and the mechanical and electrical devices used to operate it," and later charged the jury, "where one skilled in the art would not be led by a study of the patent to the construction, mode of operation and results embodied in the accused device, there is no infringement." Standing alone this could create a misleading impression which might have some adverse effect upon the jury's verdict. Of course, 35 U.S.C.A. § 112 does provide that "the specification shall contain a written description of the invention, and of the manner and process of making and using it, * * * to enable any person skilled in the art * * * to make and use the same * * *." This is not to say, however, that the specifications must also contain a detailed description of every possible infringing device in order to protect the patentee against a future infringement of that type. Section 112 only requires that the inventor "shall set forth the best mode contemplated by [him] of carrying out his invention." However, as the Supreme Court has noted, " * * * he is not confined to that." As they go on to observe, if this were so "most patents would be of little worth." Continental Paper Bag Co. v. Eastern Paper Bag Co., 1908, 210 U.S. 405, 418, 28 S.Ct. 748, 751, supra. Of course, a court may consider the fact that a patent suggest its infringement in determining the existence of the latter,[6] but this is not the same as a *requirement that the construction* of the accused infringing device be described literally in the patent or that all of the possible mechanical equivalents be spelled out or be directly suggested. The Court should therefore make clear in any such references that the doctrine of equivalents is applicable. For it is accurate to state that unless, to one skilled in the art, the construction of the accused device is one mechanically equivalent to that taught by the patent there can be no infringement.

■ *Sole Conscious Reliance Upon Thurber.* This objection of Thurber has reference to the part of the Court's charge which is quoted in Part I of this opinion in which the Court asked the jury to use their common sense and determine whether Ford utilized to some extent the prior art "*or,* did the Defendant [Ford] go to the protected Thurber patent and build a transmission based on their specifications and drawings." Even more pointed was the instruction, "If it ap-

6. We find nothing contrary to our conclusions, for example, in this passage from Westinghouse v. Boyden Power Brake Co., 1898, 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136, pressed with such vigor by Ford: "If the method pursued by the patentee for the performance of the function discovered by him would naturally have suggested the device adopted by the defendants, that is in itself evidence of an intended infringement; but, although Mr. Boyden may have intended to accomplish the same results, the Westinghouse patent, if he had had it before him, would scarcely have suggested the method he adopted to accomplish these results." 170 U.S. at page 573, 18 S.Ct. at page 724.

pears that the Defendant has pirated the Plaintiff's patent as shown in the claims, specifications and drawings thereof, you may find infringement as to the claim so pirated. On the other hand, if you find that one learned in the art, by a study of the prior transmission art could have constructed the accused devices without reference to the Thurber patents, or that a study of the patents would not lead to a construction of the accused devices, and that the accused devices do not operate in substantially the same way as the Thurber patents, then you will find there is no infringement." Even Ford does not really now attempt to maintain that this was an accurate statement of the law. They are content to answer merely that taken in context it was not misleading. The Court should be careful in any such discussions of the prior art or the significance of it, to make clear that infringement does not depend on a conscious use, or even knowledge, of the patent. If the device infringes it does so without regard to the innocence or good faith of the infringer. See Eastman Oil Well Survey Co. v. Sperry-Sun Well Surveying Co., 5 Cir.; Kansas City Southern Ry. v. Silica Products Co.; and 3 Walker, Patents §§ 450 and 453, all supra.

■■■■ Of course, as pointed out above in Part I, a deliberate conscious appropriation of an invention whether done subtly by sophisticated imitations or more crudely by outright copying, is still infringement. Infringement does not require moral wrongdoing, but if infringement exists it is not the less so because of purposeful imitation.

*Inoperativeness.* Thurber complains of the following sentence from the Court's charge: "Patents on machines that won't work are not worth the paper they are written on and the best proof as to whether a patent machine will work is production thereof as distinguished from paper claims and drawings." This sentence occurred in the course of the Court's discussion of the "new and useful" concept and was not intended as a direct reference to the Thurber devices

or as a comment upon their practicability. We are confident the Court did not, as Thurber alleges, mean this as an expression of its preference for corporate inventors like Ford over individuals like Thurber who are not able to put their inventions into mass production.

■■■ *Patent Philosophy.* During the course of the Court's charge it said, "the philosophy underlying the patent law was perhaps best stated by the Supreme Court in 1882 * * *." It then went on to quote from Atlantic Works v. Brady, 1883, 107 U.S. 192, 200, 2 S.Ct. 225, 231, 27 L.Ed. 438, a passage including the following: "It was never the object of those laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures. * * * [That] creates a class of speculative schemers * * * to lay a heavy tax upon the industry of the country * *." Although this quotation may have added little to the Court's charge, it was after all accurate in its own way, and a quotation from a Supreme Court opinion bearing on the requirement of invention. It was not an abuse of discretion on the part of the Trial Court to include it in his charge.

■■■ *The "exciting" discovery.* At least three times in the Court's charge he included the requirement of "exciting" as part of the standard of invention. "I call your particular attention to the requirement that something new, unexpected and exciting must result from the combination of old elements before the statute of invention is achieved." Thurber contends that there is nothing very exciting about automobile transmissions, particularly to a jury who has heard someone talk about them for three and one-half weeks, and that this standard imposed an "insurmountable burden" upon Thurber. In the total context we do not regard this as harmful but we do feel that this was an unfortunate choice of words for the

Trial Court to use in describing the standard of invention.

Ford counters that this is really little different from the standard applied by the Supreme Court in Great Atlantic & Pacific Tea Co. v. Super Market Equipment Corp., 1950, 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162. There the Court observed, "This case is wanting in any unusual or surprising consequences from the unification of the elements here concerned, and there is nothing to indicate that the lower courts scrutinized the claims in the light of this rather severe test." We do feel, however, that "new, unexpected and *exciting*" has emotional overtones beyond the descriptive "unusual or surprising" and should be avoided.

*Interpretation of Claim Language.* Thurber's primary objection to the Court's charge was its failure to specifically point out, with relation to the claims involved, the meaning of the claim language as it relates to the alleged infringing devices. He argues that the jury may have, therefore, (1) failed to understand the claim language and interpret it in light of the specifications, (2) compared the total Thurber device with all its environmental illustrations with the total accused device without regard to the specific claims in question, (3) failed to properly interpret generic expressions or "means" clauses, and (4) failed to comprehend the *combinations* claimed by Thurber.

There is no question but what the claims are complex and drafted with language and in a style that makes them difficult if not impossible for laymen— and indeed, for most lawyers and judges —to understand. As an example of that with which the jury was confronted, we have set forth in the margin the 334-word sentence which is claim 45 of the 549 patent.[7] This is living proof to the patent truism that a "patentee may be his own lexicographer and * * * his own grammarian." Inglett & Co. v. Everglades Fertilizer Co., 5 Cir., 1958, 255 F.2d 342, 347.

Ford's answer to this allegation is primarily that Thurber had three and one-half weeks to explain all of this to the jury and there was nothing which the Court could possibly add. Such reasoning, of course, if applied mechanically would eliminate in many cases any neces-

---

7. "A hydraulic power transmission mechanism for a motor vehicle having an engine controlled by a throttle operable by an accelerator pedal, comprising driving and driven shafts, a hydraulic torque transmitting means for transmission of torque between said shafts and comprising a casing containing fluid and means driven by the driving shaft for circulating the fluid in the casing to transmit torque from the driving shaft to the driven shaft at infinitely variable speed ratios from zero speed to approximately the speed of the driving shaft, a gear set between said torque transmitting means and the driven shaft having means providing a plurality of forward gear ranges, a reverse and neutral, manual means operable to select a forward or reverse change in the gear set, and means responsive to the speed of the driven shaft and conditioned by said manual selecting means for selecting different forward gear ranges automatically, said manual selecting means being also operable independently of the automatic selecting means to select a forward or reverse change in the gear set or to place the gear set in neutral, fluid pressure means operable to effect a gear range change in the gear set, the torque transmitting means being normally operable to transmit torque to the gear set in a selected gear range from zero to approximately the speed of rotation of the driving shaft, a reservoir containing fluid, means for conducting fluid from the reservoir to said hydraulic torque transmitting means and for returning fluid to said reservoir, valve means operable to supply fluid to said fluid pressure means to effect a gear range change in the gear set, controlling means for said valve means, and means responsive to the speed of rotation of the driven shaft in conjunction with the throttle operating movement of the accelerator pedal for rendering operative said valve controlling means, said valve means being also operable by movement of the accelerator pedal beyond the full open throttle position to effect a gear range change in the transmission mechanism."

sity for relating abstract principles of law to the specific facts involved in the case before the jury. That the law is otherwise is generally undisputed. "It is technically erroneous to give an instruction embodying applicable law in abstract form, and also error to give instructions which are mere abstract statements of the law inapplicable to the case in any of its phases." 53 Am.Jur., Trial § 573 at 451 (1945).

But it is hardly that simple. Thurber, on the basis of cases we characterize as "old," not because longevity saps them of persuasiveness, but because of the simple contrivances dealt with in those times,[8] insists that the Judge must tell the jury what the claims mean. Thurber likens a patent claim to any other written document such as a contract, as to which the court ordinarily declares its meaning. Union Bag & Paper Corp. v. Mitchell, 5 Cir., 1949, 177 F.2d 909.

 But if the meaning is uncertain or the document open to more than one interpretation, that fact is normally one for the jury. Occasionally such difference is so well pinpointed and defined that the court can safely delineate it to the jury in sharply drawn alternatives. But the judge need not, and ought not, do that if it cannot reasonably be done with accuracy or there is a real danger that a shorthand summary will be misleading or inaccurate. If that is the case the jury must be left, as is so often the situation in a long and complex trial, to choose between the versions extensively presented through the camps of opposing witnesses.

Here the meaning of this weird terminology, of which note 7, supra is but a minor example, had been the subject of extended examination, cross examination,

rebuttal and surrebuttal. Wayman's testimony, for example, covers 390 pages. Discussed in conjunction with prior art, what was or was not mechanical equivalents, the jury heard and reheard the conflicting opposing contentions of each side and that of their votaries and professionally trained experts. How is a judge to boil down a 334 word "sentence" to something manageable? Presumably the skilled patent solicitors thought this abstruse terminology essential or it would not have been used. Must the judge, untutored as a specialist in this highly specialized calling, have to outguess the experts and undertake to describe in traditional language the construction and mode of operation of a complex device for which the solicitor considered the claims language alone adequate? In dealing with a complex mechanism discussed in intricate language by the experts, portrayed by beautiful and expensive charts and drawings, compared with language used in similarly confounding papers, how can the judge, with fairness and accuracy, and free of inadvertent slanting, summarize it by an authoritative deliverance to the jury?

If this leaves the matter somewhat less than satisfactory it is the unavoidable consequence of seeking a jury trial on a matter which traditionally is left to the judge. And where there is, as was the case here, controversy as to the meaning of claims, the minimum would be a submission of requests, in writing, setting forth the respective contentions on interpretation and the significance, i. e., on the verdict, of a finding one way or the other by the jury. Here none of the three or four requests of this nature met that standard.

8. Coupe v. Royer, 1895, 155 U.S. 565, 15 S.Ct. 199, 39 L.Ed. 263 (shaft around which leather is wound for conditioning); Transit Development Co. v. Cheatham Electric Switching Device Co., 2 Cir., 1912, 194 F. 963 (electric railroad switch); National Car-Brake Shoe Co. v. Terre Haute Car & Mfg. Co., C.C.

D.Ind., 1884, 19 F. 514 (railroad car brake shoe); Cahoon v. Ring, C.C.D.Me., 1861, 4 Fed.Cas. page 1011, No. 2,292 (simple grain seeding machine); Washburn v. Gould, C.C.D.Mass., 1844, 29 Fed. Cas. page 312, No. 17,214 (wood planing device).

Under these circumstances, in a charge which repeated verbatim the contentions of the parties, in the language desired by them, and which runs over 50 pages in the record, the Court was not in error in failing to again read aloud the 20 claims in suit, or worse, read and then undertake, in two or three hours time what the experts had taken days to do, to summarize each. It was sufficient to submit for each juror a separate set of claims, supply the jury with all of the exhibits and explanatory charts, and then trust to their recollection of the weeks of testimony. If at that late date in the trial the jury had to be told again what each side claimed about each element of each claim of each patent, we would have to acknowledge realistically that any such charge, written or oral, would simply be beyond the intelligent comprehension and assimilation of any jury of lay persons. Some reasonable adaptation had to be made, and that followed by the Judge was certainly that.

### III.

#### Judgment

The result is, therefore, that the verdict cannot stand because of intrinsic errors on evidence, and the case must be remanded. It may be that the Defendant, by moving promptly, and within 10 days, F.R.Civ.P. 50, after receipt in the District Court of this Court's mandate, might be able to present the matter in a way that would enable the District Court to consider whether a judgment n. o. v. ought to be entered on the basis of the Defendant's motion for instructed verdict, and thus avoid what might well turn out to be a useless trial.

However, we are careful to point out that we are not ruling or even intimating at this time that an instructed verdict ought to have been granted, because with a highly complex record of this kind, this is a matter which should be determined in the first instance by the District Court with its more comprehensive understanding of the case gained from the three weeks of trial. Nor are we determining at this time whether this may be done under the principles of Globe Liquor Co. v. San Roman, 1948, 322 U.S. 571, 68 S.Ct. 246, 92 L.Ed. 177; Cone v. West Virginia Pulp and Paper Co., 1947, 330 U.S. 212, 67 S.Ct. 752, 91 L.Ed. 849; and similar cases. See Yorkshire Indemnity Co. of New York v. Roosth & Genecov Production Co., 5 Cir., 1958, 252 F.2d 650, 657 note 11; cf. Johnson v. New York, N. H. & H. R. R., 1952, 344 U.S. 48, 73 S.Ct. 125, 97 L.Ed. 77; Annotation 97 L.Ed. 90; 2 Barron & Holtzoff, Federal Practice and Procedure § 1081 (1950) and 1958 Wright Supplement; and 5 Moore, Federal Practice par. 50.07—.14 (1951) and 1958 Vestal Supplement.

We are unable to find from our own research any case presenting precisely this situation. It seems clear that were we to examine the evidence to test whether, as a matter of law, Thurber made out a jury case we could not do more than grant a new trial which we do now on Thurber's appeal. But this is not the same as suggesting that consideration be given to determining whether the procedure is open to the Defendant in the District Court. See Theriot v. Mercer, 5 Cir., 1959, 262 F.2d 754, 760–761. Such a procedure would effectuate the underlying policy stated by the Supreme Court in Globe, supra.

> "Determination of whether a new trial should be granted or judgment entered under Rule 50(b) calls for the judgment in the first instance of the judge who saw and heard the witnesses and has the feel of the case which no appellate printed transcript can impart." 322 U.S. at page 574, 68 S.Ct. at page 247; quoting from Cone v. West Virginia Pulp and Paper Co., supra, 330 U.S. 212, 216, 67 S.Ct. 752.

The case must therefore be reversed and remanded for a new trial or such further and consistent proceedings as may be open.

Reversed and remanded.