**Loretta A. LAIRD, Helen V. Laird and Eagle Star Insurance Company, Limited, Appellants,**

v.

**AIR CARRIER ENGINE SERVICE, INC., Appellee.**

**No. 17359.**

United States Court of Appeals
Fifth Circuit.

Feb. 27, 1959.

Rehearing Denied March 25, 1959.

James R. Mattison, Milwaukee, Wis., for appellant.

Douglas D. Batchelor, Miami, Fla., Smathers, Thompson & Dyer, Miami, Fla., of counsel, for appellee.

Before TUTTLE, JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This cause grows out of the crash on December 17, 1954, of the Miller's Highlife airplane resulting in the death of four persons and the destruction of the plane. In this action against ACES (Air Carrier Engine Service, Inc.) asserting that the 1954 crash in Wisconsin was caused by negligent engine overhaul in Miami during 1951, the jury returned a general verdict for the defendant. This appeal of the unsuccessful plaintiffs does not challenge the sufficiency of the evidence. Indeed, they say it is precisely because it was one of hotly disputed questions with great technical complexity, that made it so important that, in the procedural aspects of the case, the jury be afforded the full picture. The complaint is primarily that after the trial commenced the Court permitted ACES to repudiate a crucial pretrial stipulation and thereafter failed

950

to adhere to the protective conditions impliedly imposed as the price for repudiation.

As this markedly narrows the field, only a brief resume of the facts is needed. And what is stated is set forth in the broadest of terms primarily to portray how this procedural problem arose and why its influence was significant. We sound this caveat lest on the retrial which we order, the parties or the Court draw the unwarranted inference that in this preview we have attempted judicially to declare what the facts are, or what their mechanical or judicial significance might be. What we are trying to say is that whatever capacity we have as Judges to write with some assurance on the law, we are not skilled in the intricacies of airplane engines or the delicate process of engine overhaul and testing. Our description of the mechanics involved is an avowed oversimplification with all of the risks of technical inaccuracy of that approach. The plane crashed during take-off due to failure of one or both engines. The plaintiffs' theory was that the immediate cause was the failure of the left engine. In turn, the failure of this engine was due to the fracture of the crankshaft. This, in turn, was caused by progressive fatigue in the body of the crankshaft resulting from stresses set up in the threads of the crankshaft and crankshaft bolt. On plaintiff's theory, this brought legal responsibility home to ACES. For the climax of plaintiff's claim was that these thread stresses were caused by the use of a different crankshaft bolt in the run-out test from that used in final reassembly. Such a practice was in violation of certain specified technical orders and manufacturers' service bulletins with which a certificated CAB aircraft maintenance concern had to comply.

This composite theory was at the heart of the trial. As the trial unfolded, the controversy raged over the basic issue: was the same crankshaft bolt used in the run-out test and in the final reassembly?

But until some time *after* the trial commenced, this issue was not in the case. This was so because at the pretrial hearing, held about two weeks before the trial, ACES formally stipulated that the same crankshaft bolt had not been used on run-out test and final reassembly. It is not questioned that such stipulation was both articulate and deliberately made. The lengthy pretrial hearing, held in chambers but stenographically reported, reflects that both of these able adversaries were well prepared. By this time extensive pretrial discovery activities had been completed. A great amount of scientific and technical data had been assembled. Scientists of the National Bureau of Standards and representatives and inspectors of the Civil Aeronautics Board had been examined under searching depositions. The subject of the depositions included examination of, tests on, and opinions drawn from, parts of the engine including the fractured crankshaft salvaged from the wreckage. Perhaps of most importance, the depositions included one taken of Charles McCullough, the shop superintendent of ACES.

In that deposition given on November 26, 1956, McCullough swore categorically that the same crankshaft bolt was not used on run-out test and final reassembly.

The result was—and this was the purposeful intention of all—that the trial would then determine whether (a) failure to use the same bolt was negligence and (b) if so, was that a proximate cause of the crash.

But the trial turned out to be quite different. The jury panel was examined and a jury selected. Just as plaintiffs' counsel was to begin his opening statement on his theory encompassing this stipulation, defense counsel for the first time tentatively indicated that ACES might repudiate the stipulation. The statement was that counsel over the week end had learned that some papers in ACES' files indicated that probably the machinery necessary for using differ-

ent bolts in run-out and reassembly had not been procured until 1954 so that such method could not have been used in 1951 on the engine involved here. ACES' trial counsel who argued the case before us acknowledged with his characteristic candor that this development was certainly a new one, and that he had no doubt that plaintiffs' counsel was actually and legally surprised.

█ No motion for continuance was then made by plaintiffs. We think none was then required. The statement was at most a tentative repudiation of the stipulation. And to the Court's inquiry whether ACES wanted to change the stipulation, no significant response was made.

The trial of the case began with time largely consumed in the presentation of some of the numerous depositions. No indication was forthcoming as to what ACES intended to do about the stipulation. Toward the end of the first day plaintiffs' counsel requested that the Court permit them to read to the jury the exact words ACES' counsel had stated in the pretrial hearing which constituted the categorical admission on the use of separate bolts. After first stating that on counsel's representation that he had just discovered the true facts, the Court would not hold counsel to the stipulation, the Court made a ruling which was both significant and relieved plaintiffs of the obligation to then move for a continuance. The Court stated:

> "You can read that testimony. That statement was somebody's deposition. That will be sufficient. He [ACES' counsel] said he made a mistake, and if he did make an honest mistake I will not hold him to strict accountability, because I understand he might not know exactly what happened out there."

The Court's reference to "that testimony" was to the deposition of Charles C. McCullough.

This left the matter then with the plain statement that the Court would permit plaintiffs to "read that testimony". Since this gave the plaintiffs the right to offer the words of the witness having knowledge of the facts as an outright admission against ACES, there was no particular reason to persist in the request to read the lawyer's summation of it or request a continuance because of the change of position.

But again things didn't turn out that way. Near the end of the second day the plaintiffs came to the place for McCullough's testimony. But the plaintiffs were not permitted to read the deposition of McCullough. The Court required that McCullough, then available as a witness, be placed on the stand as plaintiffs' witness. Despite repeated requests the Court declined to permit the plaintiffs to examine him as an adverse witness. The plaintiffs' only opportunity to "read that testimony" was to confront the witness McCullough with it as a prior inconsistent statement. But this was far different from offering it either as an admission or as testimony. ACES' counsel successfully argued that, as he had himself learned from a recent opinion of ours, Tropical Marine Products, Inc. v. Birmingham Fire Ins. Co., 5 Cir., 1957, 247 F.2d 116, 120 note 8, 1957 A.M.C. 1946, 1951 note 8, this was not affirmative proof of the crucial fact, i. e., use of different bolts. Indeed, on the basis of this vital distinction, ACES subsequently objected successfully to a hypothetical question put to an expert because it assumed this fact which had not been proved.

So it was not until the trial was nearly a third over that plaintiffs learned that the stipulation had now been repudiated and that the Court had declined to adhere to its previous assurances. The plaintiffs' strong opposition to these cumulative actions had already been brought sharply to the attention of the Court. As the Court had not yet felt that this was sufficiently prejudicial to the plaintiffs to cause it to rule favorably on the protests, there is no indication that, at this juncture, the ruling would have been otherwise. Under these circumstances a motion for continuance

would have been a paper formality and the plaintiffs' standing to complain here is not prejudiced by the failure to make any such move.

██ But even conceding that this action was wrongful, the plaintiffs have a heavy burden in showing that such procedural matters, each relatively small and isolated, caused real harm. We think this has been done. One cannot read this record without the definite impression that from this abandonment or repudiation of the stipulation the whole course of the trial, the whole tenor of it, changed.

This change was portrayed with dramatic and graphic sharpness. At the moment the case was called and the jury picked, the identity or whereabouts of the crankshaft bolt was altogether unimportant. It was unimportant because all then agreed that the one in the engine at the time of the crash was not the one at the time of the run-out tests. But with the repudiation of the stipulation, all was changed. Now, if plaintiffs were to meet or rebut the case being testified to by McCullough and supported inferentially by lack of entries in ACES' routine records or certificates of overhaul, it became suddenly essential to prove the specific identity of the bolt at the time of the crash. Testimony contained in the deposition of one employee of the Bureau of Standards giving routine identification data of specimens, photographs and test parts now had acute relevance. So, too, did deposition testimony that suggested that the bolt had been surrendered by CAB or the Bureau of Standards to the workman's compensation insurer of Miller's Brewery Company. The suggestion was strong that someone on the plaintiffs' side or interested directly or indirectly in the outcome, had surreptitiously done away with the bolt. So ominous was this lurking suspician that plaintiffs' counsel felt compelled to take the stand as a witness to negative any such conduct on his part.

What had started then as a serious battle over complex scientific and mechanical facts and phenomena had now taken on the marks of a mystery. The assurances by ACES' counsel, no doubt given with sincerity, in his argument to the jury that it was not intended to implicate plaintiffs' counsel personally, did not remove this from the case. Nor was it meant to. ACES urged this for all it was worth, and what it was worth was to inject serious moral overtones into a case which but a moment before was one almost bereft of any such content. That is not to say that it was, or would be, improper to exploit the human equation of this lawsuit. What we say is that the parties did not come prepared to try a case which contained the seeds of this controversy which had such dramatic implications, and impact.

And once this issue was turned loose, the plaintiffs had no effective weapon of rebuttal. Discovery was then over. The trial had begun. What could be learned had to be learned from the witness stand or by frantic efforts in the recesses between court sessions. Those who might know the true facts were scattered from Wisconsin to Washington to Miami. Who it was who turned over the bolt, where he now resided, who it was who had received the part, if at all, where he now lived, or what he might know, were all things beyond the practical reach of the plaintiffs who were then in the arena in the midst of a contest different from that begun.

We do not need to pinpoint the precise error. Whether it was erroneous under these circumstances to permit the withdrawal of the stipulation, we do not have to decide. The Court recognized the value of the stipulation and the significance of the change. To meet it, the Court ruled that the underlying testimony of the one having knowledge (McCullough) could be introduced by the plaintiffs. But this was not permitted. The plaintiffs who came to Court expecting to try one lawsuit found themselves facing something quite different. Now they had neither admission nor testimony. What they had was what was left of the pieces.

■ The Court does have the right, and it should never fail to exercise it, to relieve counsel of stipulations to prevent manifest injustice. F.R.Civ.P. 16, 28 U.S.C.A. But the Court is responsible for seeing that suitable protective terms or conditions are imposed to prevent substantial and real harm to the adversary. What those terms or conditions might be no one can forecast. In one case it might be a continuance. In others it might be the making of a new stipulation to permit the receipt in evidence of data or material or statements now relevant and trustworthy, but lacking in some technical admissibility. Whatever form it takes, the protection must be as full as needed to assure that the authorized change does not subject the adversary to irreparable and irretrievable harm.

Pretrial is a marvelous instrument in the search for justice. As it narrows issues, as it reduces the field of fact controversy for resolution by court or jury, as it simplifies the mechanics of the offer and receipt of evidence, it is serving a function of high value. Its aim though is to assure justice with a maximum of efficiency in time and expense of court, of counsel, and of litigants.

Here its function was of even greater than usual importance. The case was one of great mechanical complexity. It was interstate in occurrence. It was interstate in evidence. The intricate facts to enable a jury intelligently to reach a verdict had to be gathered long before trial. If it developed on the trial that evidence was insufficient or that new issues were present, it would likely be too late to remedy the defect. It was vital then that both parties know what the trial was going to be about. Only in that way could either safely undertake it. In that atmosphere, when a stipulation of such awesome significance was deliberately but voluntarily made, the whole purpose of pretrial would be jeopardized if not thwarted by the withdrawal of the stipulation unless full and effectual action was taken by the Court to avoid harm.

The responsibility was on the Court. In the nature of things the Court, and the Court alone, could fashion those measures which would make the result fair.

■ In reaching this conclusion, we have not done so by regarding counsel's statement at the pretrial hearing as an admission of an agent in the ordinary sense. An attorney, as any other agent, may make statements which the law attributes to the principal. Lawyers can and frequently do make statements which, had the client made them, would be admissible as admissions. Whether they are admissible against the principal depends, as with any other agency, on the scope of the agent's (attorney's) authority. Such statements as admissions are received as evidence and may be refuted.

■ An attorney has wide authority in the conduct of litigation. He is chosen to speak for the client in Court. When he speaks in Court, whether it be on a formal trial or in an informal pretrial, he speaks for and as the client. Those statements or agreements which dispense with proof of facts are made with respect to the impending trial and until withdrawn are not merely evidence as in the case of an ordinary admission. They are absolutely binding. As long as they stand, they foreclose the matter altogether. See, generally, as to admissions by attorneys, McCormick, Evidence § 244 at 520 (1954); Restatement, Agency §§ 284–291 (1933); Am.Jur., Attorneys at Law §§ 67, 68, 85 (1936); Am.Jur., Evidence § 592 (1939); 97 A.L.R. 374.

■ We mention this specifically because we think that a statement of the kind made here in the pretrial hearing is in the category of a binding statement. The attorney is not clothed generally with the authority to make serious statements of a factual nature in the course of a pretrial hearing except for the purpose of simplifying issues and agreeing on those matters which need not be further proved. That is the sole

function of the lawyer's statement in pretrial. That is what the client has committed to him as the agent. Until withdrawn, the statement is absolutely binding. But when the Court permits its withdrawal, the statement has fulfilled its function. It does not then become one in the category of an ordinary admission receivable merely as evidence of the facts stated.

Any other rule would largely destroy the utility of pretrial. How pretrial is carried on varies from court to court, indeed from judge to judge. Some are extremely formal, with elaborate hearings in open court attended by litigants and counsel resulting in a memorial order wrapping up the whole proceeding. Others are carried on in chambers, some with no record kept save the final pretrial order which may be simple or may be complex. Others, as in the Court below, are in chambers with a court reporter present. But the whole process is aimed at trying to reduce the forthcoming trial to its simplest terms consistent with the full preservation of the basic positions and rights of the litigants. That process, as was true here in the hearing which covers thirty-five pages of the record, unavoidably involves a running statement between Court and all counsel. Frequently, as was certainly true here, the process of inquiry and answer is the catalyst by which agreement comes.

If counsel, attending these conferences pursuant to the coercive power of Rule 16 must hold himself back for fear that if the hearing is unproductive or the result is abortive, the client may be faced with the prospect that his defender has suddenly become the admission-witness against him, pretrial will stagnate. Counsel will be muzzled. The informal give-and-take, the exploration of areas of agreement and disagreement, now so productive of stipulation between responsible advocates, will have to end.

After all, the term pretrial carries its own limitations. It is a prelude to the forthcoming trial. The hearing has to do with the impending trial. The Statements are made with respect to that trial.

It is to preserve the fluidity of pretrial discovery and simplification of the case that admissions are for the purposes of the present case only. See e. g., F.R.Civ. P. 36.

As long as the statement stands, it is binding absolutely. Once the Court relieves the party of the statement, it has left the case and is neither binding nor admissible as evidence of the facts stated. In this way the effectiveness of pretrial proceedings will be maintained. See Maryland Casualty Co. v. Rickenbaker, 4 Cir., 1944, 146 F.2d 751, and Smith Contracting Corp. v. Trojan Construction Co., 10 Cir., 1951, 192 F.2d 234.

Reversed and remanded for a new trial.