John P. K. FONTAINE and Aurelia Fontaine, Appellants,

v.

George D. PATTERSON, District Director of Internal Revenue, Appellee.

No. 19141.

United States Court of Appeals
Fifth Circuit.

June 29, 1962.

Winston B. McCall, Birmingham, Ala., William S. Pritchard, Winston B. Mc-Call, Birmingham, Ala., Pritchard, Mc-Call & Jones, Birmingham, Ala., of counsel, for appellants.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson and David O. Walter, Thomas H. McPeters, Attys., Dept. of Justice, Washington, D. C., Wm. L. Longshore and Macon L. Weaver, U. S. Attys., Birmingham, Ala., for appellee.

Before BROWN and WISDOM, Circuit Judges, and DeVANE, District Judge.

DeVANE, District Judge.

This appeal involves income taxes for the year 1956 in the amount of $16,-781.87, exclusive of interest. The tax was paid on February 26, 1960, and a claim for refund was filed on March 21, 1960. The claim for refund was denied and this action was instituted in the District Court for the Northern District of Alabama on July 5, 1960. A jury trial was had and final judgment was entered against the taxpayer on March 30, 1961.

The issue in the Court below was whether the patent royalties received by the taxpayer in 1956 were generated by the sale of taxpayer's basic patent on January 20, 1949, and thus were taxable as capital gains as contended by taxpayer, or were generated by the sale of taxpayer's improvement patent on July 1, 1956, and thus were taxable as ordinary income as contended by the District Director. The jury found for the District Director.

The questions presented by this appeal are:

1. Whether the District Court erred in denying taxpayer's motion for a directed verdict and motion for a judgment notwithstanding the verdict; and

2. Whether the District Court erred in denying taxpayer's motion for a new trial upon grounds to be discussed later.

John P. K. Fontaine, hereinafter referred to as the taxpayer, is the president and majority stockholder of the Fontaine Truck Equipment Company, Inc., an Alabama corporation, that manufactures truck trailers and auxiliary truck equipment, including "fifth wheels". A fifth wheel is the coupler mounted on a truck tractor for the purpose of coupling and carrying a semi-trailer.

The basic or dominant patent under which the corporation manufactures the fifth wheels was issued to the taxpayer on December 21, 1948, as Patent No. 2,456,826. On January 20, 1949, taxpayer transferred to his substantially wholly owned corporation by written sales agreement the exclusive right to make, use and sell his invention in all states situated east of the west line of the States of Texas, Oklahoma, Kansas, Nebraska, South Dakota and North Dakota. The agreement was recorded in the United States Patent Office on October 18, 1950. The agreement provided that the taxpayer was to receive a royalty in the amount of 50% of the profits from the sale of all the fifth wheels manufactured by the corporation during the remaining term of the patent. The corporation and the taxpayer were to settle their accounts yearly on the 15th of December. Although the sale occurred on January 20, 1949, the corporation was not obligated to pay any royalty until 1950.

An improvement or subservient patent relating to fifth wheels was issued to the taxpayer on December 13, 1955, as Patent No. 2,726,878. On July 1, 1956, taxpayer transferred to his corporation by a written sales agreement the exclusive right to make, use and sell this invention in all States of the United States. This sales agreement made no mention or reference to the basic or dominant patent and related solely to the transfer of the improvement or subservient patent. The agreement provided that the taxpayer was to receive a royalty in the amount of 5% of the gross sales of all fifth wheels manufactured under the patent during

the remaining term of the patent. The corporation and taxpayer were to settle their accounts monthly beginning with the month of July, 1956.

In 1956, the year in question, the corporation paid taxpayer royalties in the amount of $44,051.65. The royalties were computed by applying 5% to gross sales of fifth wheels from July 1, 1956, to December 31, 1956. No royalty was computed or paid on sales made in the first six months of that year. The royalty was computed monthly. The taxpayer reported the royalties as long-term capital gain in his 1956 income tax return. The capital gains schedule revealed that the royalty was paid for the transfer of the patent acquired by the taxpayer on December 13, 1955, and sold on July 1, 1956. On audit the Internal Revenue Service determined that the royalty was ordinary income under the provisions of Title 26 U.S.C., 1958 Ed., Section 1239.

The only issue in the Court below was factual, i. e., whether the royalties received by the taxpayer during the year 1956 were generated by the sale of the basic patent on January 20, 1949, or by the sale of the improvement patent on July 1, 1956. Taxpayer contended that the royalties were generated by the sale of the basic 1949 patent. The District Director contended that the royalties were generated by the sale of the improvement patent issued December 13, 1955. The jury was instructed to find for the taxpayer if the royalties were generated by the 1949 sale, and for the District Director if generated by the 1956 sale. As stated above, a verdict was returned in favor of the District Director upon the issues in the trial of the case and final judgment was entered on March 30, 1961, pursuant to the verdict of the jury.

Two assignments of error are made on this appeal as follows:

1. The denial by the District Judge of taxpayer's motion for a directed verdict and for judgment notwithstanding the verdict under Rule 50 of the Federal Rules of Civil Procedure, 28 U.S.C. and denial of the District Court of the motion for a new trial, which accompanied the motion for a judgment notwithstanding the verdict; and

2. The trial Court erred in requiring taxpayer's attorney to take the witness stand as an adverse witness for the Government and permitting Government counsel to call a revenue agent for the purpose of impeachment of the testimony of taxpayer's attorney.

Since the holding of the Court on assignment of error No. 2 will necessitate a new trial in this case, for the purpose of brevity the Court will dispose of that assignment first.

In the trial of this case the District Director was successful in confining the factual issue in the case to the question of whether the royalties received by the taxpayer during the year 1956 were generated by the sale of the basic patent of January 20, 1949, or by the sale of the improvement patent of July 1, 1956. The exhibits introduced in evidence in the case generally support the contention of taxpayer that the royalties received during the year 1956 were generated by the basic patent of January 20, 1949, but the testimony of taxpayer and his witnesses brought into the case conflicting facts with reference to this issue. That is to say that taxpayer, who owned dominating control of the corporation, did numerous things in dealing with himself as the owner of the patents and as the owner of the corporation tending to support the contention of the District Director that the improvement patent of July 1, 1956, generated the royalties received by the taxpayer during the year 1956. For example, the written contract reducing the royalty payments from 50% of net profits to 5% of gross income was included as a part of the contract by which the taxpayer assigned to his corporation the improvement patent. And further, taxpayer's C.P.A. in preparing the income tax returns for 1956 er-

roneously reported that the $44,051.65 was paid as royalties on the improvement patent. The books and records maintained by the corporation and kept by an officer thereof were to the contrary. These books and records showed that the royalties received in 1956 were generated by the basic patent contract of January 20, 1949, and were paid on account of that contract. The hiatuses in the record bearing on this issue flow in part out of the fact that taxpayer directed the bookkeeper to change the royalties under the 1949 contract from 50% of net profits to 5% of gross without any formal written change whatever in the contract. Taxpayer testified that he assumed that the royalties specified in the contract of July 1, 1956, was all that was needed to change the royalty payment specified in the contract of January 20, 1949, and he directed the officials and employees of the company in collecting royalties on the 1949 contract to follow those specified in the July 1, 1956, contract.

The District Director called taxpayer's bookkeeper as his witness and her testimony was very damaging to the District Director. It was at this point that the District Director called Winston B. McCall, the attorney for taxpayer, as an adverse witness and over appropriate objections subjected him to the examination set out in footnote 1 below.[1]

1. "Q. Are you the same Mr. McCall who is representing Mr. John P. K. Fontaine?
"A. I am.
"Q. In this action?
"A. I am.
"Q. And have you represented Mr. John P. K. Fontaine in this tax matter from the very beginning?
"A. I have.
"Q. And were you representing Mr. Fontaine at the time that the Revenue Service first informed Mr. Fontaine that there was a question about the legal treatment of the royalties he received in 1956?
"A. I was.
"Q. Now, Mr. McCall, did you at that time appear before the Revenue Service or talk to the Revenue Service or any of the agents about the case?
"A. I have had a number of conferences with a number of agents.
"Q. Mr. McCall, I wish you would note for the jury from defendant's Exhibit 1, the date of the protest that you prepared and filed?
"A. The date is June 16, 1959. Let me see it, please, sir. That is correct.
"Q. And is this marked received by the Internal Revenue Service June 19, 1959?
"A. That is correct.
"Q. Now, Mr. McCall, prior to that time you filed with the Revenue Service, I believe on August 2, 1958, a letter brief in this case, did you not?"
After the Court required the witness to answer the question, he stated:
"A. Yes, sir, I did.
"Q. Is what has now been marked defendant's Exhibit No. 4 a copy of that letter?
"A. That is correct. Let me see it? Yes, sir.

"Q. And associated with that is that a copy of the transfer of title which is mentioned in the letter?
"A. No.
"Q. It is not?
"A. It was not attached to the letter * * *.
"Q. I know it was not. I don't know whether it was or not. It is now. Had you furnished that copy to the Revenue Service?
"A. That had been furnished to the Revenue Service, transfer of title, transfers of title to two patents and both of them were returned to me by the Internal Revenue Service.
"Q. I don't believe that is responsive. I will get that later.
"Q. Mr. McCall, at the time this letter was written, you had furnished the Revenue Service only that transfer of title?
"A. That is not true.
"Q. Why does it say in your letter, 'We have previously furnished you a copy, a copy of the sales agreement transferring the patent right'?
"A. We had furnished to the Internal Revenue Service the two patents. They had requested the two patents and the two sales agreements.
"Q. As of August—
"A. I am certain of that because they returned both of them to me in a Government envelope. They returned both patents and both sales agreements.
"Q. At the last part of that letter it has, 'It is therefore respectfully requested that this adjustment be eliminated and that the tax treatment of this item as a capital asset, as reported by taxpayers be

As soon as McCall was sworn and qualified as a witness, counsel for the District Director had McCall identify a letter written by him to the Internal Revenue Service dated August 2, 1958, and upon its identification offered it as Government Exhibit No. 4. Upon receipt of this letter in evidence, counsel for the District Director did not read it to the jury, but merely questioned McCall about certain parts of it, taking sentences completely out of context and asking him about them. This resulted in an angry exchange between counsel for the Government and McCall. To this letter was attached a copy of sales contract of July 1, 1956, relating to the improvement patent between taxpayer and his wholly controlled corporation, conveying to the latter the title to the 1956 patent. McCall denied that this contract was attached to his letter when he sent it to the Internal Revenue Service and counsel for the Government admitted that he did not know whether or not it accompanied the letter. All he knew was that when the letter was furnished him the contract was attached thereto. Witness McCall testified that he had on a much earlier date furnished the Internal Revenue Service with a copy of each of the contracts, which they had examined and later returned to him.

Upon McCall being excused, counsel for the District Director immediately called Harry C. Evans, the Internal Revenue Agent who handled taxpayer's case, as a witness for the Government. The testimony of Evans is set out in footnote 2 below.[2]

confirmed.' Isn't that right? Is that what it says?

"A. The treatment as a capital asset be confirmed.

"Q. As reported by the taxpayer refers to treatment as a capital asset.

"Mr. Frazer: Your Honor, we would like to offer that.

"Mr. McCall: We have no objection, but we invite it to the attention of the Court.

"Q. How was this reported in the tax return?

"A. I never saw the tax return until 11 o'clock yesterday. I saw a copy of it. The agent told me it had been treated as a capital asset and that he was going to change it to ordinary income. And I cited authorities showing there was no basis in law for the treatment of that item as anything except capital asset and you agreed to that in the pre-trial hearing.

"Q. As reported in the tax return—

"A. Don't quibble with me about that. That doesn't refer to what the letter says. The letter refers to the treatment of it as a capital asset and that is what we referred to as reported in the tax return.

"Q. Now, Mr. McCall, isn't it a fact that up until after the Revenue Service ruled against your position, that you took the position and you argued this position before the Revenue Service that the amount reported in the tax return of $44,000.00 came from the agreement of July 1?

"A. That is not true.

"Q. You never once mentioned that?

"A. We did not.

"The Court: Just a moment, gentlemen. I think we are getting down into the field of contentions and not facts.

"Mr. Frazer: All right, Your Honor, I don't have any further questions.

"The Witness: I want to say in reply that I filed the first written statement of facts filed with the Internal Revenue Service by me and set out specifically that what the company made the payments in question for was patent 2456826, this patent was the quid pro quo, and that is the first patent and that is the first written statement the Internal Revenue Service in connection with it other than the brief I filed on the law.

"Q. The date of that was 1959?

"A. That is correct.

"Q. That first brief was 1958?

"A. That is correct."

2. "Q. Sir, would you state your name?

"A. Harry C. Evans.

"Q. Your address?

"A. 308 LaPlaya Place, Homewood.

* * *

"Q. Your position?

"A. Internal Revenue Agent.

"Q. How long have you been with the Revenue Service?

"A. Since December, 1948.

"Q. In the course of your duties with the Revenue Service, were you assigned

The substance of Evans' testimony was that he had never seen or heard of the contract of January 20, 1949, during the course of his examination of the

to audit and investigate the return for Mr. Fontaine for 1956?

"A. Yes, sir, I was.

"Q. How about the corporation?

"A. Yes, sir.

"Q. Did you perform that service?

"A. Yes, sir.

"Q. Did you inspect the books of the corporation?

"A. Yes, sir.

"Q. Did you talk to the bookkeeper?

"A. Yes, sir.

"Q. Did you talk to the C.P.A.?

"A. Yes, sir.

"Q. Did you talk to Mr. Winston B. McCall?

"A. Yes, I talked to Mr. McCall after there was a disagreement about the treatment.

"Q. Did Mr. McCall ever, at any time, tell you that the taxpayer Mr. Fontaine was relying on the 1949 agreement as the royalties were paid under the 1949 agreement up until the time that he filed, that he received an adverse ruling from the Washington Office at some later date?

"A. No, sir, I did not know anything about the 1949 patent agreement until after Mr. Fontaine had had a conference in Washington.

"Q. At that time, were you furnished at that time a copy of the 1946 patent, 1948 patent, excuse me.

"A. No, sir.

"Q. At that time they furnished you a copy of the agreement that transferred that first patent to the corporation?

"A. No, sir.

"Q. Now with Mr. McCall's agreement, did you pass on the facts that he had presented you, did you request some technical assistance from the Washington Office?

"A. Yes, sir, I did.

"Q. And what was the result based on the facts Mr. McCall and you sent up there, what was the result?

"A. The ruling was against the taxpayer. They said the income should be reported as ordinary income.

"Q. At that time did Mr. McCall request a conference in Washington?

"A. I am not certain. Mr. Fontaine requested a conference.

"Q. When was the first time you heard about the contention that the taxpayer is now making, that the amounts were received under that January 20, 1949, agreement?

"A. It was after Mr. Fontaine had had his conference in Washington in the latter part of 1948.

"Q. What year?

"A. 1958.

"Q. So at the time Mr. McCall filed this brief of August 2, 1958, had he at any time mentioned the 1949 agreement?

"A. No, sir.

"Q. August 2, 1958. Excuse me. Did he, or did he not, mention the '49 agreement at that time?

"A. No, sir.

"Q. Here is the copy of the agreement attached to that defendant's Exhibit 4, is that the only agreement that Mr. Winston McCall had furnished to the Revenue Service up until that time?

"A. Yes, sir, that is the only transfer of title dated July 1956, was the only document I had showing transfer of title.

"Q. At that time, was Mr. McCall's contention and only contention that the amounts received came under this agreement and were capital gains anyway in spite of coming under this agreement?

"A. That is true.

"Q. This agreement is the 1956 agreement?

"A. Yes."

Cross Examination

(By Mr. McCall):

"Q. Now, Mr. Evans, you know that is not true. I ask you to look at this agreement now and request the Court's permission to go into details about it. Mr. Evans, I want to ask you if the letter says in this ruling the Commissioner gave consideration to its position in the Coplan Case, the Myers Case and the Champayne Case which had been relied upon by the taxpayers in discussion with Revenue Agent Evans during the course of examination, isn't that true?

"A. Yes, sir.

"Q. Didn't we rely on those cases?

"A. Yes, sir.

"Q. Don't know those cases were before the 1951 Code?

"A. Yes.

"Q. The 1951 Amendment?

"A. Yes, sir.

"Q. Don't you know that those cases are the cases that relate to sales of patents before 1951?

"A. I am not sure when.

"Q. Doesn't the ruling that I referred to in the paragraph refer only to cases decided before the 1951 Act?

"A. I think so, yes.

"Q. You agreed with that?

"A. Yes.

"Q. Now, don't I say in there, 'The facts in the instant case are not distin-

facts in this case. He testified the only contract he had seen or heard anything about was that of July 1, 1956.

■■ The effect of this was to sharply portray to the jury a situation in which the lawyer, as counsel for the taxpayer, though called by the Government as a witness, was made out as one not telling the truth, as one not worthy of belief, as one not worthy of being listened to. There was no effort in this record to show that McCall's testimony, adverse as it was to the Government, was an actual or even legal surprise. What, and all, that appears is that the Government put McCall on the stand and then put on the Revenue Agent to give testimony categorically in contradiction of it. Under these circumstances, this was not simply the offering of testimony from several witnesses whose stories were or might be in conflict. It was, in effect and purpose, an outright impeachment of McCall. As we have many times held a witness may not be called in order that he might be impeached. Laird v. Air Carrier Engine Service, 263 F.2d 948 (5th Cir.); Young v. United States, 97 F.2d 200, 117 A.L.R. 316 (5th Cir.); Fong Lum Kwai v. United States, 49 F.2d 19 (9th Cir.). While ordinarily this might not call for a reversal, we think the consequences here were both significantly adverse and not reasonably capable of being eradicated. The impeachment, going to the very question of basic truth telling, was immediate and spectacular. More than that, it did not involve the party or a mere witness. It directly concerned the lawyer for a party. The role of a lawyer as courtroom advocate, though well understood by Judges and fellow lawyers, is not always so clear to jurors or other laymen. It takes no vivid imagination to foresee that if the suspicion of the jury is aroused about the basic credibility of the lawyer as a witness, the client's whole cause, regardless of its merits, might well fall with the discredited lawyer-witness. The prejudicial error in the admission of this evidence necessitates a reversal and the ordering of a new trial.

■ Nothing needs to be said on assignment of error No. 1, except the Court holds that when this case is retried by the Court below, the District Director of Internal Revenue Service is entitled to a jury trial, if he so desires, based upon the jury questions resulting from the conflicts in the testimony of taxpayer's witnesses.

The judgment appealed from is vacated and the case is remanded.

Reversed and remanded.

---

guishable from the facts in the cases relied on,' isn't that the words?

"A. That is what you say.

"Q. Are you telling this jury that you did not have both of those transfers and both patents and that you did not return those to my office and give them to me?

"A. That is right, I did not have them.

"Q. What I am trying to find out is when did you give them back to me?

"A. I returned them to Mr. Fontaine.

"Q. You had them and you returned them to Mr. Fontaine.

"A. The 1949 patent was never mentioned, I didn't know anything about it until the matter was taken up with the Internal Revenue Office by Mr. Fontaine.

"Q. You knew about these cases we were relying on, didn't you?

"A. Yes, sir, I have read them.

"Q. And every one of them was related to the '49 patent. They couldn't be related to the '55 patent?

"A. I didn't know this had anything to do with the '49 patent.

"Q. Did you know neither one of these cases could have any relation at all to the '55 patent?

"A. I don't know that.

"Q. I will ask you if every case that is cited that we relied on does not refer to the law prior to 1951. Now, you know that?

"A. I believe they do."